**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**STATESVILLE DIVISION**
**CIVIL ACTION NO. 5:14-cv-16**

| | |
|---|---|
| CARL WAYNE CARPENTER, JR. AND NATISHA CARPENTER, <br><br> **Plaintiffs,** <br><br> v. <br><br> INVESTIGATOR SCOTT EDWARD REED, OFFICER CHARLES KURFEES, CITY OF STATESVILLE, TOM ANDERSON, <br><br> **Defendants.** | **ORDER** |

**BEFORE THE COURT** is Defendants Scott Edward Reed, Charles Kurfees, the City of Statesville, and Tom Anderson's Motion for Summary Judgment and accompanying brief in support.  (Docs. 45, 46).  Plaintiffs Carl Wayne Carpenter, Jr. and Natisha Carpenter filed a response (Doc. 48), to which Defendants replied, (Doc. 50).  This Court granted leave for Plaintiffs to file a supplemental response limited to the presentation of evidence ascertained from information collected from the granting of Plaintiffs motion to compel.  (Doc. 58).  Thereafter, Plaintiffs filed a supplemental response, (Doc. 59), and Defendants filed a supplemental reply, (Doc. 60).

## I.    STANDARD OF REVIEW

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In order to support or oppose a summary judgment motion, a party is required to cite to "materials in the record, including depositions, documents, electronically stored

1

information, affidavits or declarations, . . . admissions, interrogatory answers, or other materials;" or show "that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1); *Anderson v. Liberty Lobby,* 477 U.S. 242 (1986) (applying former version of Rule 56); *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986) (same).  A genuine dispute exists only if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson,* 477 U.S. at 248.  In conducting its analysis, the Court views the evidence in the light most favorable to the non-moving party. *Celotex Corp.,* 477 U.S. at 325.

## II.    STATEMENT OF FACTS

J.C. is the son of Plaintiff Natisha Carpenter and is the stepson of Plaintiff Carl Wayne Carpenter, Jr ("Carl").  In February 2011, J.C. was a student at Pressly Alternative School.  Defendant Kurfees was employed by the Statesville Police Department as a school resource officer at Pressly at that time.  (Kurfees Aff., Doc. 46-4, at 5:25).

On February 3, 2011, J.C. met with the guidance counselor, Ms. Grega.  Unbeknownst to Grega, J.C. was involved in a fight with another boy his age several days before.  (J.C. Dep., Doc. 48-33, at 56:14-15).  J.C. was hit by the fists of the other boy in the face, head, and ribs.  (*Id.* at 56:14-16).  The fight bloodied J.C.'s nose and left scratches of his left wrist and neck.  (*Id.* at 56:18-25 – 57:1-7).  J.C. was struck on the temple, the mouth, and the back of the head.  (*Id.* at 57:8-11).  J.C. did not tell Grega about the fight with the other boy but instead blamed the aforementioned injuries on Carl.  (*Id.* at 58:5-19).  Grega asked if there were any bruises or marks and J.C. responded by showing her the injuries on his left wrist and the right side of his neck.  (*Id.* at 58:24-25 – 59:1-4).  He also told her that his ribs were hurting, even though there

was nothing wrong with his ribs.  (*Id.* at 59:8-9).  He stated that there were no knots on his head or marks of any kind on his head.  (*Id.* at 59:12-17).

At some point, the guidance counselor invited Kurfees into the room.  (*Id.* at 33:25). Kurfees attempted to take pictures of J.C.  (*Id.* at 34:11).  The photographs have not been admitted by either side.  However, multiple witnesses state that they did not substantiate any injuries.  (Reed Dep., Doc. 58-28, at 24:12-13) (McCoy stated that "the pictures did not come out very good"); (Caras Dep., Doc. 48-32, at 14:23-25) (McCoy stated that "the photos did not show the marks on him as clear as they could be seen."); (Natisha Dep., Doc. 48-31, at 144:8-10-145:3-7) (stating that there were two photos, both were blurry, all they showed was a red mark on what appeared to be skin).

At one point in his deposition, J.C. states that Kurfees, the guidance counselor, and he all "talked a little bit."  (*Id.* at 34:11).  Later in the deposition, J.C. states that he did not "recall telling [Kurfees] anything.  In fact, I don't think I ever told him anything."  (*Id.* at 137:13-14).[1] J.C. elaborated by saying that the only person he told about Carl physically harming him was the school counselor.  (*Id.* at 138:4).  The counselor repeated the allegations made to her by J.C. to Kurfees.  (*Id.*; *see also id.* at 41:24-25).

Kurfees then contacted the Iredell Department of Social Services ("DSS").  (Kurfees Dep., Doc. 46, at 36:18-24).  Kurfees also wrote an Incident Report that was signed off on by his sergeant the next morning, February 4, 2011 at 9:19 a.m.  (*Id.* at 232:3-8).  The report was then assigned to Reed.  (*Id.* at 232:17-20; Doc. 48-28, at 186:19).

---

[1] Kurfees states he spoke directly to J.C. and that J.C. told him a multitude of things, including that Carl threw him onto the floor; punched him in the head; and assaulted him.  These allegations are however, directly disputed. Kurfees also stated that when he entered the room J.C. appeared upset and was crying.  J.C. stated that he did not remember whether he was crying or upset at that time.  (Doc. 48-33, at 117:24-25-118:1-3); *but see* (Doc. 48, at 10) (stating that J.C. "scoffed at the idea that he opened up to Kurfees" without providing substantiating citation).

DSS dispatched social worker Cynthia McCoy to investigate the allegations. J.C. told McCoy that Carl picked him up and threw him in the kitchen. (*Id.* at 25:25). McCoy's affidavit states that during her interview with J.C., she learned that, in December 2010, he had been beaten with a dog leash by Carl. (Doc. 46-6, at ¶ 9). Further, she states that she was informed that, in 2010, Carl slapped J.C. across the face, picked him up, and threw him on the ground. (*Id.*). She states that J.C. did not talk about the 2010 incident because he had been threatened by Carl. (*Id.*). McCoy states that J.C. informed her that on February 2, 2011, Carl threw him in the bedroom when he refused to clean the living room. (*Id.* at ¶ 13). J.C. denies that this occurred and denies informing McCoy of the same. (Doc. 48-33, at 26:17-25). McCoy also states that J.C. informed her that Carl threatened him against talking to DSS by stating that he would break J.C.'s leg and "make sure that J.C. does not talk again." (*Id.* at ¶ 14). J.C. denies that this occurred and denies telling anyone that he had been threatened. (Doc. 48-33, at 27:1-6). McCoy stated that J.C. told her that he was afraid of Carl. (Doc. 46-6, at ¶ 16). J.C. admits that he spoke to people at DSS and informed them that he was afraid of his parents, specifically that he was afraid of being physically harmed. (Doc. 48-33, at 28:19-25 – 29:1). McCoy eventually authored a report regarding these events. (Doc. 48-28, at 29:20-22).

Later that day, Natisha and Carl came to Pressley at McCoy's request. (Doc. 46-6, at ¶ 21). McCoy states that both indicated that Carl had not hit J.C. that week. (*Id.* at ¶¶ 21-22).

In February 2011, Defendant Reed was working as a Detective in the Criminal Investigations Division at the Statesville Police Department. (Reed Aff., Doc. 46-7, at ¶ 3). Reed was the lead officer of the investigation. (*Id.* at ¶ 58). Reed's involvement began on February 4, 2011 (*id.* at ¶ 9; *see also* Reed Dep., Doc. 48-28, at 42:10-12, 95:13-14). Reed received the Incident Report written by Kurfees. The Incident Report provides as follows:

On 02/03/2011 at 1300 hrs while performing my duties as the School Resource Officer at Pressly School the school counsilors Mrs. Grega and Mr. Marcy advised me of a situation involving the victim.

Mrs. Grega and Mr. Marcy advised me that on approx. December 7th, 2010 the suspect whooped the victim with a dog leash over his entire body leaving scratches. The suspect also choked the victim and put him against the wall. This incident was reported to Iredell County DSS and was investigated but the victim refused to talk with the DSS case worker. The victim stated to me that he was afraid of what would happened and he did not trust anyone. The victim then stated on January 31, 2011 that another incident occurred where the suspect threw the victim in the kitchen floor and punched him. Then the victim sat in the dog chair and the suspect punched the victim in the head leaving a knot on the back right side of his head and red marks on his nose. The victim stated that his right side of his head was sore and that he had been having headaches the following two days. Another incident occurred on February 1st, 2011 where the victim was assaulted by the suspect again. The victim stated in November 2010 that the suspect gave his biological father which is the suspect brother some oxycotin pills to sell. There is report of possible abuse of the four younger children in the house. The DSS worker Ms. McCoy is going to following up on. The victim was placed into foster care tonight by Iredell County DSS.

(Doc. 46-5, at 4).

Reed and another investigator went to the Carpenter's home and to speak with Natisha Carpenter, J.C.'s mother. (Doc. 48-28, at 12:3-12). The goal was to investigate the allegations of child abuse. (*Id.*). Natisha agreed to come to the police department to speak with them. (*Id.*). Natisha first denied all allegations of abuse. (*Id.* at 12:19-20). Reed then asked her to volunteer for a Computer Voice Stress Analysis ("CVSA") test. (*Id.* at 12:20-22). She agreed and signed a waiver indicating her consent to take the CVSA. (*Id.*; *see also* Doc. 46-9). Reed had received training and a certification with respect to the CVSA from the National Institute for Truth Verification. (*Id.* at 62:10). The CVSA began sometime before 9:57 a.m. (*Id.* at 71:4). After the test was performed, two other members of the Statesville Police Department reviewed the tests and all agreed that deception was indicated on the test. (*Id.* at 83-84; 13:1-17). After the CVSA was performed, Reed re-interviewed Natisha and she ultimately prepared a written statement. (Doc. 46-10; Natisha Dep. 92-99). Natisha also told Reed that she was scared of Carl and reported several threats he had made to her. (*Id.* at 13-18).

The statement indicated that she had seen Carl "rough house the boys"; whip J.C. with a belt; jerk J.C. up by his shirt and push him on the bed; slap J.C. on the mouth for being

5

"mouthy"; and slap the kids for misbehaving. (*Id.*). Natisha stated that she has slapped J.C. in the mouth for being mouthy, refusing to listen, or for refusing to do as asked. (*Id.*). She continued, stating that she had seen Carl jerk J.C. up and "sling him in his room." (*Id.*). She stated that Carl had made some of the kids stand in the corner if they misbehaved. (*Id.*). She also stated that Carl did not get mad easily but gets frustrated when the children do not do what they are asked to do or when they do not listen. (*Id.*). She indicated that some, but not all of the children were afraid of Carl. (*Id.*). However, she indicated that one of her daughters told her that nothing occurred between J.C. and Carl on the dates J.C. indicated he was beaten and that everything "seemed fine." (*Id.*). She also stated that J.C.'s biological father informed her that J.C. had posted on Facebook before August 3, 2011 that he was going to foster care, which is something that he had been telling her for a few weeks at the time. (*Id.*). Natisha wrote that "I believe Carl needs anger management or counseling." (*Id.*).

Prior to arresting Plaintiffs, Reed interviewed J.C. at Pressly. (Doc. 48-28, at 14:1-19, 104:19-24). Kurfees was present during this interview. (*Id.*). Reed states that J.C. was visibly upset and frightened; that J.C. reported to him that he did not want anything to happen to his sisters; that he was hit with a dog leash over his entire body; and hit and choked (*Id.* at 104:19-25); however, J.C. states that he was not upset, stated that he did not tell Detective Reed that he did not want anything to happen to his sisters, and stated that he did not tell Reed that Natisha was present during the dog leash incident, (Doc. 48-33, 118:1-24). Later in his deposition, J.C. states that he only spoke to Reed one time and could not remember what it was about. (Doc. 48-33, at 121:9-10). Reed did not take any pictures of J.C. and he did not personally examine him. (Doc. 48-28, at 98:20-24). Once the interview with J.C. concluded, Kurfees told Reed that he felt knots on J.C. and observed bruises on J.C. (*Id.* at 14:13-14). Kurfees also informed Reed

that, during a DSS interview, a minor child whispered to the DSS worker that "Daddy beats [J.C.]." (*Id.* at 14:16-19).

After this interview, Reed returned to the Carpenter residence. (*Id.* at 19:23-25 – 20:1-122). Both Carl and Natisha agreed to come to the Statesville Police Department. (*Id.*). Carl spoke to Reed, denying all allegations of abuse but stating that "J.C. had a smart mouth and he has popped him in the mouth." (*Id.* at 21:8-20). He did not perform a CVSA test on Carl. (*Id.* at 21:23).

At 3:27 p.m., DSS supervisor Elizabeth Caras sent a fax containing the report authored by McCoy to the Statesville Police Department. (Caras Dep., Doc. 48-32, at 113:12-24). The report is titled "Child Protective Services Incident Report" and states as follows:

```
Investigation/. Prior CPS/ No WFFA/ CAD attached

t/S that Josh fears for his life.  He lives with his mother and step-father.
There are 4 other children in the home.  The child is saying that on Tuesday,
his step-father threw him to the ground and kicked him in the head and in the
ribs.  On Monday, the step-father punched him in the head area with a closed
fist.  This family has been involved with DSS before and Josh was afraid to
tell how he is treated because the step-father has threatened him.  He has
told him that if he tells he will make it so he could not talk anymore.  The
child is finally willing to talk about how he is being treated.  He was
afraid to talk before because he knew he would have to go back home.  The
mother was married to the step-father's brother and had Josh.  Then she
married Karl and had 4 children.  The mother and step-father are getting
divorsed and things are getting worse.  Josh is saying that if he has to go
home he is going to run away.  DATE: 02/03/11 BY: FRAZIER
-------------------------------------------------------------
```

At some point on February 4, 2011, Reed applied for and received a warrant for Carl's arrest. (Warrant, 11-CR-050808, Doc. 48-2). Reed swore that there was probable cause of the following: that on December 7, 2010, Carl hit J.C. with a dog chain and chocked him with the chain causing marks all over his body, and cut of his airway. (*Id.*). The warrant charged Carl with felony child abuse under N.C. Gen. Stat. § 14-318.4(a). (*Id.*). J.C. testified that he never made any of the allegations contained in the 11 CR 050808 warrant and that the events never occurred. (Doc. 48-33, 47:17-25-49:4).

Carl was arrested at 4:00 p.m. on February 4, 2011. (Arrest Report, Doc. 48-4).

Several other warrants were applied for and issued on February 9, 2011. Prior to applying for these warrants, Reed spoke with McCoy and consulted with the District Attorney's office. (Doc. 48-28, at 133:22-25-134:1-14). Specifically, Reed had a quick conversation with McCoy who stated that the photos did not turn out well but that she and Kurfees could testify to the severity of J.C.'s injuries. (*Id.*) Reed consulted with the Mikko Red Arrow, Assistant District Attorney, and provided him with the facts of the case and asked if there were any other charges that needed to be filed. (Doc. 48-28, at 170:20-21; *see also* Doc. 46-7, at 2). Arrow advised him to charge Carl with two additional charges of felony child abuse and two charges of assault by strangulation. (Doc. 46-7, at 2). He further advised Reed to charge Natisha with three charges of misdemeanor child abuse. (*Id.*). Reed applied for and received the warrants. Specifically, the warrants allege against Carl: that on January 31, 2011, he hit J.C. in the back of the head causing knots; that on December 6, 2010, he assaulted J.C. by cutting off his airway by strangulation by choking with his hands after slamming him to the ground; that on December 6, 2010, he picked J.C. up and slammed him into the ground and choked him; and that on December 7, 2010, he cut off J.C.'s airway by wrapping "the leash around the neck." (Doc. 46-7, at 8-11).

The allegations against Natisha provide that she engaged in misdemeanor child abuse by allowing Carl to pick J.C. up, slam him into the ground, and then choke him on December 6, 2010; that she allowed Carl to hit J.C. in the back of the head causing knots on the back of the head on January 31, 2010[2]; and that she allowed Carl to choke J.C. with a dog leash on December 7, 2010. (Doc. 46-7, at 12-14).

---

[2] The Court believes the notation "January 31, 2010" is a typo considering the date of the warrant for Carl regarding the same incident.

J.C. denied that these allegations occurred and has denied that he made any of the statements contained in the warrants to anyone. (Doc. 48-33, at 49:5:-22, referring to warrant 11-CR-50936); (*Id.* at 49:23-25 – 50:1-18, referring to warrant 11-CR-050940); (*Id.* at 51:22-25 – 52:1-17, referring to warrants 11-CR-050941 and 11-CR-050942); (*Id.* at 50:19-25 – 51:1-22, referring to warrants 11-CR-050938 and 11-CR-050937).

With regard to the allegations J.C. claims he actually made to the guidance counselor and the DSS employee, J.C. has sworn under oath that they are untruthful and that they were said as "part of the plan to leave the house." (*Id.* at 59:8-9). He believed living with foster parents would give him "more freedom [to] do more things that [he] liked to." (*Id.* at 44:1-2). Eventually, J.C. felt bad that his parents were arrested and he told District Attorney Mikko that he had fabricated the statements to guidance counselor and the DSS social worker. (*Id.* at 45:21-25 – 46:1-8). Natisha testified that the charges against her and Carl were dismissed because J.C. recanted. (Doc. 48-31, at 155:12).

Prior to placing Carl under arrest on February 4, Reed did not meet with McCoy or review any documents or pictures that she sent over, aside from the Child Protective Services Initial Report. (Doc. 48-28, at 184:18-22, 185:21). Reed did not review J.C.'s student files. (*Id.* at 97:2-5). Reed never saw the pictures taken of J.C. by Kurfees but was told they "did not come out very good." (*Id.* at 16:8) (24:12-14) (stating that Reed was informed on February 9, 2011 by McCoy that the pictures did not come out very good). Reed indicated that he "received Ms. McCoy's notes at some time" but he could not recall when. (*Id.* at 185:21-22).

Regarding an investigation into the credibility of J.C.'s allegations, Reed stated that he relied upon his interview, Kurfees' experience with J.C., and the fact that the child's body language and his upset demeanor were indicators of truthfulness. (*Id.* at 99:21-25 – 100:1-3).

He also relied upon his interviews of the Carpenters and Natisha's written statement. (*Id.* 102:5-13). Reed agreed that obtaining information concerning someone's propensity to tell the truth is relevant to determine whether they are credible. (*Id.* at 103:7-11). However, he stated that the nature of the allegations required a quick response in J.C.'s case, (*id.* at 103:18-20), particularly the fact that J.C. appeared frightened and scared, (*id.* at 104:14-25).

The DSS record has no prior substantiated instances of child abuse. (Doc. 48-32, at 115:1-10). There was substantiation of neglect on August 27, 1993. (*Id.* at 114:20-25).

## III.    CLAIMS PRESENTED

Plaintiffs' Complaint sets forth six counts: Count I is stylized "Violation of the Fourth and Fourteenth Amendments" and is brought under 42 U.S.C. § 1983. (Doc. 1, at 10). Count II is brings claims of false arrest and illegal imprisonment pursuant to North Carolina common law against all Defendants. (*Id.* at 11). Count III brings negligent hiring, retention, and supervision causes of action pursuant to North Carolina common law against Defendants Anderson and City of Statesville. (*Id.* at 12). Counts IV and V set forth intentional and negligent infliction of emotional distress causes of action against all Defendants. (*Id.* at 12-13). Count VI alleges that Plaintiffs are entitled to punitive damages. (*Id.* at 13).

Reed and Kurfees are sued in their individual and official capacities. (*Id.* at ¶ 8). Anderson is sued in his official capacity as Chief of the Statesville Police Department. (*Id.* at ¶ 9).

## IV.    ANALYSIS

### A.    Count I: § 1983

#### 1.    Standards

Plaintiffs are making a claim pursuant to 42 U.S.C. § 1983[3] against Defendants Kurfees, Reed, Anderson, and the City of Statesville.

"[A]llegations that an arrest made pursuant to a warrant was not supported by probable cause, or claims seeking damages for the period after legal process issued, are analogous to the common-law tort of malicious prosecution." *Brooks v. City of Winston-Salem, N.C.*, 85 F.3d 178, 182 (4th Cir. 1996). Malicious prosecution pursuant to § 1983 requires that "[1] the defendant have seized plaintiff pursuant to legal process that was not supported by probable cause and [2] that the criminal proceedings have terminated in plaintiff's favor." *Massey v. Ojaniit*, 759 F.3d 343, 356 (4th Cir. 2014) (quoting *Durham*, 690 F.3d at 188); *see also Evans v. Chalmers*, 703 F.3d 636, 647 (4th Cir. 2012). "[W]here a law enforcement officer acts pursuant to a warrant, the critical question is whether the officer *could have reasonably thought* there was probable cause to seek the warrant." *Wadkins v. Arnold*, 214 F.3d 535, 539 (4th Cir. 2000) (emphasis in original). In their motion, Defendants do not contest that the proceedings terminated in Plaintiffs' favor or that Plaintiffs were seized. Therefore, the Court will analyze whether Defendants had probable cause.

"Probable cause is determined from the totality of the circumstances known to the officer." *Brown v. Gilmore*, 278 F.3d 362, 367 (4th Cir. 2002). "For probable cause to exist, there need only be enough evidence to warrant the belief of a reasonable officer that an offense

---

[3] 42 U.S.C. § 1983 provides, in pertinent part, that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

has been or is being committed; evidence sufficient to convict is not required." *Id.* "[A]n officer is not required to 'exhaust every potentially exculpatory lead or resolve every doubt about a suspect's guilt before probable cause is established.'" *Miller v. Prince George's County, MD*, 475 F.3d 621, 630 (4th Cir. 2007) (quoting *Torchinsky v. Siwinski*, 942 F.2d 257, 264 (4th Cir. 1991)).

"Two factors govern the determination of probable cause in any situation: 'the suspect's conduct as known to the officer, and the contours of the offense thought to be committed by that conduct.'" *Brown*, 278 F.3d at 368 (quoting *Pritchett v. Alford,* 973 F.2d 307, 314 (4th Cir.1992)). "[I]t is irrelevant to the probable cause analysis what crime a suspect is eventually charged with . . . or whether a person is later acquitted of the crime for which she or he was arrested." *Sennett v. United States*, 667 F.3d 531, 535 (4th Cir. 2012) (quotations and citations omitted). "When a police officer protects a suspect's rights by obtaining a warrant from a neutral magistrate, the officer should, in turn, receive some protection from suit under 42 U.S.C. § 1983." *Torchinsky*, 942 F.2d at 262. "It is surely reasonable for a police officer to base his belief in probable cause on a victim's reliable identification of his attacker." *Id.*

Obtaining a warrant from a magistrate weighs in favor of a finding that an officer acted with objective reasonableness. *Id.* However, obtaining a warrant will not insulate an officer if they supplied false information to the magistrate. *See Massey*, 759 F.3d at 357. Deliberately providing false statements will run afoul of the Fourth Amendment when said statements are material, namely when they are "'necessary to the finding of probable cause.'" *Id.* (quoting *Miller v. Prince George's Cnty, Md.*, 475 F.3d 621, 628 (4th Cir. 2007). In determining whether a particular statement is material, the court "'excis[es] the offending inaccuracies' and assess[es] whether the 'corrected' evidence, excluding the misstatements, 'would establish probable

cause.'" *Id.* (quoting *Miller*, 475 F.3d at 628). Further, "the false statements must have been

made 'deliberately or with a reckless disregard for the truth,' which may be proved by showing

that 'when viewing all the evidence, the affiant must have entertained serious doubts as to the

truth of his statements or had obvious reasons to doubt the accuracy of the information he

reported.'" *Id.* (quoting *Miller*, 475 F.3d at 627).

In order to evaluate probable cause in this case, it is necessary to view the offenses in

question. Accordingly, the Court will examine felony child abuse, misdemeanor child abuse,

and assault by strangulation under North Carolina Law. The Court notes that North Carolina has

a legitimate interest in enforcing said statutes to "curtail[] the abuse and neglect of its minor

citizens." *Hodge v. Jones*, 31 F.3d 157, 164 (4th Cir. 1994).

Felony child abuse under § 14-318(a) requires proof of the following:

> A parent or any other person providing care to or supervision of a
> child less than 16 years of age who intentionally inflicts any
> serious physical injury upon or to the child or who intentionally
> commits an assault upon the child which results in any serious
> physical injury to the child is guilty of a Class D felony

N.C. Gen. Stat. § 14-318.4(a); *see also State v. Williams*, 517 S.E. 2d 619, 621 (N.C. Ct. App.

2002) (providing three elements). "Serious physical injury, within the meaning of G.S. § 14–

318.4, is injury that causes 'great pain and suffering.'" *Williams*, 517 S.E. 2d at 621 (quoting

*State v. Phillips*, 399 S.E. 2d 293, 303 (N.C. 1991)). "In determining whether an injury is

serious, pertinent factors to consider include, but are not limited to: hospitalization, pain, loss of

blood, and time lost from work." *State v. Romero*, 595 S.E.2d 208, 210 (N.C. Ct. App. 2004).

"However, neither the statute nor [North Carolina] case law demand that an injury require

immediate medical attention in order for it to be considered a 'serious physical injury.'" *Id.* at

211 (quoting *Williams*, 571 S.E. 2d at 622). "Furthermore, because the nature of an injury is

dependant upon the relative facts of each case, whether an injury is "serious" is generally a question for the jury." *Id.*

Misdemeanor child abuse under N.C. Gen. Stat. § 14-318.2(a) requires provides as follows:

> Any parent of a child less than 16 years of age, or any other person providing care to or supervision of such child, who inflicts physical injury, or who allows physical injury to be inflicted, or who creates or allows to be created a substantial risk of physical injury, upon or to such child by other than accidental means is guilty of the Class A1 misdemeanor of child abuse.

"N.C. Gen. Stat. Sec. 14–318.2(a) establishes three separate and distinct offenses: '[T]he parent by other than accidental means (1) inflicts physical injury upon the child, (2) allows physical injury to be inflicted upon the child, or (3) creates or allows to be created a substantial risk of physical injury.'" *State v. Woods*, 321 S.E.2d 4, 6 (N.C. Ct. App. 1984) (quoting *State v. Fredell*, 195 S.E. 2d 300, 302 (N.C. 1973)). Misdemeanor child abuse has a differing level of injury required, namely it requires "non-serious physical injury." *Phillips*, 399 S.E. 2d at 302.

Assault by strangulation is covered under N.C Gen. Stat. § 14-32.4(b) and provides that "any person who assaults another person and inflicts physical injury by strangulation is guilty of a Class H felony." "[E]vidence that defendant applied sufficient pressure to [the victim's] throat such that she had difficulty breathing," [is] sufficient to constitute strangulation under the statute." *State v. Lowery*, 743 S.E.2d 696, 699 (N.C. Ct. App. 2013) (quoting *State v. Braxton*, 643 S.E. 2d 637, 642 (N.C. Ct. App. 2007)). "'[C]uts and bruises on [the victim's] neck' confirmed by photographic evidence was sufficient evidence to fulfill the physical injury element of assault by strangulation." *Id.* (quoting *State v. Little*, 654 S.E. 2d 760, 764 (N.C. Ct. App. 2008)); *see also State v. Landford*, 736 S.E.2d 619, 624 (N.C. Ct. App. 2013) (approving instruction stating that "strangulation is defined as a form of asphyxia characterized by closure of

the blood vessels and/or air passages of the neck as a result of external pressure on the neck brought about by hanging, ligator or the manual assertion of pressure.") (citation and internal quotation marks omitted).

2.      Kurfees and Reed : Individual Capacity Claims

A large portion of Defendants' motion is premised on facts that are disputed. J.C.'s deposition testimony indicates that (1) none of the events specified in the warrants ever occurred; and, more importantly, (2) that he never told someone that these events occurred. J.C.'s sworn testimony indicates that he only blamed a scratch on his wrist and neck on Carl when speaking to the Grega, the guidance counselor. J.C. has also admitted to speaking to people at DSS and stating that he was afraid of his parents, specifically that he was afraid of physical violence. Further, J.C. admitted that he told DSS that Carl picked him up and threw him in the kitchen. The undisputed fact is that pictures were taken of the event and they did not substantiate the injuries that were alleged. Natisha's statement also does not corroborate the allegations made in the warrants. She stated that some of the kids were afraid of Carl and that he needs counseling, but nothing that would substantiate the allegations made in the warrants.

Accordingly, for the purposes of this motion, it is disputed whether the information provided to the magistrate was false. It is also disputed whether the information Kurfees provided to Reed was false.[4] If the Court were to excise the purportedly false information, then the warrants would be left all but bare. It remains whether the information provided in the warrants was done deliberately or recklessly. At this stage, the Court must infer that (1) the statements in the warrants were never made to Kurfees or to Reed and (2) that both Kurfees and

---

[4] The Court finds that whether Kurfees' conduct proximately caused Plaintiffs' injuries is an issue for trial. *See Evans v. Chalmers*, 703 F.3d 636, 647 (4th Cir. 2012) (constitutional torts "require a demonstration of both but-for and proximate causation.").

Reed interviewed J.C. and as a <u>result (in part) of that interview</u> initiated a process which ultimately caused the arrest of both Natisha and Carl on allegations that they knew were not verified in either of their encounters with J.C. Moreover, the Court cannot rely on Defendants' characterization of the extent of his injuries and his behavior because J.C. denies their characterizations. *See Cloaninger v. McDevitt*, 555 F.3d 324, 333 (4th Cir. 2009) ("We cannot rely on the officers' characterization of Cloaninger's behavior because he denies it."). Further, Reed's failure to examine J.C. or to even notice the extent of his injuries gives rise to the inference that J.C. did not exhibit "serious" injuries as required by § 14-318(a).

Defendants have also moved to dismiss this count on the grounds of qualified immunity. "Qualified immunity, when found to apply, bars § 1983 suits against government officers in their individual capacity." *Id.* at 330. Qualified immunity is an immunity from suit and will be lost if a case is "if a case is erroneously permitted to go to trial." *Id.* (quoting *Mitchell v. Forsyth*, 472 US. 511, 526 (1985)). Determining whether a case should be dismissed on qualified immunity grounds requires two inquiries:

> First, [a court] must decide whether a constitutional right would have been violated on the facts alleged. Next, assuming that the violation of the right is established, courts must consider whether the right was clearly established at the time such that it would be clear to an objectively reasonable officer that his conduct violated that right.

*Id.* (quoting *Bailey v. Kennedy*, 349 F.3d 731, 739 (4th Cir. 2003). "If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." *Id.* at 331 (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)).

Defendants largely analogize the facts of their case to *Torchinsky*; however, the Court finds that *Tochinsky* is distinguishable. In *Torchinsky v. Siwinski*, 952 F.2d 257 (4th Cir. 1991),

the victim identified a person to law enforcement as his assailant and later recanted. When the wrongly identified assailant later brought a § 1983 claim, the Fourth Circuit held that dismissal was appropriate where the assailant "proffered no evidence to rebut [the officer's] sworn statement" proffered in the warrant. *Id.* at 262. Here, through J.C.'s sworn testimony, Plaintiffs have largely rebutted the factual predicate required for this Court to find that probable cause existed to arrest Carl and Natisha for the crimes charged in the warrants. Accordingly, Reed cannot receive the protection that a law enforcement officer could receive by obtaining a warrant from the magistrate. Reed may also not receive additional protection through his verification with the Assistant District Attorney, because, at this stage in the litigation, the facts provided suffer from the issues of those alleged in the warrant application. *Cf Gedrich v. Fairfax Cnty. Dep't of Family Servs.*, 282 F. Supp. 2d 439, 462 (E.D. Va. 2003) (when Court had to infer, under 12(b)(6), that social worker initiated no parental contact restriction knowing sexual abuse allegations to be false, dismissal was not appropriate).

Accordingly, this case will proceed to trial. The Court is well aware of the interests that must be balanced in this case and finds the following quote from *Wolf v. Fauquier Cnty. Bd. of Supervisors* illustrative:

> In the face of a complaint alleging child abuse, DSS employees would have two choices. On the one hand, they could investigate and face § 1983 liability if their investigation was somehow imperfect or the complaint turned out to be unfounded. On the other hand, they could do nothing—and risk tragic consequences such as those illustrated by the facts of *DeShaney v. Winnebago County Department of Social Services,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), in which social services employees failed to protect a child from being so savagely beaten by his father that the child was rendered profoundly retarded.

555 F.3d 311, 323 (4th Cir. 2009). However, the testimony submitted by Plaintiffs gives rise to the inference that the investigation was much more than purportedly imperfect. Accordingly, qualified immunity will not prevent this case from going to trial. The Court is aware of the

quandary such a situation represents.  However, the problems evidenced by this case are balanced against a lawyer's (such as counsel for Plaintiffs) duty not to counsel or assist his client in fraudulent conduct, Rule of Professional Conduct 1.2(d), the criminal prohibition against perjury, *see* 18 U.S.C. § 1621, and the protections afforded by the Fourth Amendment.

### 3. Official Capacity Claims / Claims against the City of Statesville and Anderson

"The Fourth Circuit has held that official capacity claims are essentially the same as a claim against the entity, and should be dismissed as duplicative when the entity is also named as a defendant." *Davis v. Matroo*, No. 5:13-CV-00233-BO, 2013 WL 5309662, at *5 (E.D.N.C. Sept. 19, 2013) (citing *Love-Lane v. Martin*, 355 F.3d 766, 783 (4th Cir. 2004).  Plaintiffs are suing Reed, Kurfees, and Anderson in their official capacities.  However, Plaintiffs are also suing the governmental entity employing them, the City of Statesville.  Accordingly, the official capacity claims against Reed, Kurfees, and Anderson are dismissed as redundant.

"[C]laims against the officers in their official capacities are claims against the entities for which the officers were acting." *Giancola v. State of W.Va. Dep't of Pub. Safety*, 830 F.2d 547, 550 (4th Cir. 1987) (citing *Kentucky v. Graham*, 473 U.S. 149, 165 (1985).  The City of Statesville is not liable under *respondeat superior* principles, rather, "to establish liability on behalf of the entity, it must be shown that the actions of the officers were unconstitutional and were taken pursuant to a custom or policy of the entity." *Id.* (citing *Monell v. Dep't of Soc. Svcs.*, 436 U.S. 658, 690-92 (1978).  "Only if a municipality subscribes to a custom, policy, or practice can it be said to have committed an independent act, the *sine qua non* of *Monell* liability." *Owens v. Baltimore City State's Attorneys Office*, 767 F.3d 379, 402 (4th Cir. 2014) *cert. denied sub nom.* 135 S. Ct. 1893 (2015).  There are four theories that can be pursued to show a custom, policy, or practice:

> (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that "manifest[s] deliberate indifference to the rights of citizens"; or (4) through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law."

*Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (quoting *Carter v. Morris*, 164 F.3d 215, 218

(4th Cir. 1999).  However,

> [I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the "moving force" behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.

*Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 404 (1997).

Plaintiffs' Complaint alleges that it was the City of Statesville's policy to: "inadequately and improperly search, detain, and arrest citizens when lacking probable or reasonable cause to do so"; "to inadequately supervise and train its police officers, thereby failing to adequately discourage further constitutional violations on the part of its police officers"; and that "the City of Statesville . . . did not require appropriate in-service training or re-training of officers who were known to have engaged in police misconduct."  (Doc. 1, at 69-71).  The Complaint continues: "[a]s a result of the above described policies and customs, police officers of the City of Statesville . . . believed that their actions would not be properly investigated or sanctioned, but would be tolerated."  (*Id.* at ¶ 73).

Plaintiffs' Complaint alleges the third and fourth ways of proving a custom, policy, or practice.  Specifically, Plaintiff is pursuing a theory of condonation and a theory of failure to train.

"Under th[e] [condonation] theory of liability, a city violates § 1983 if municipal

policymakers fail 'to put a stop to or correct a widespread pattern of unconstitutional conduct.'"

*Owens*, 767 F.3d at 402 (quoting *Spell v. McDaniel*, 824 F.2d 1380, 1390 (4th Cir. 1987)). The

*Owens* case provides further illumination of what is required to make such a claim:

> Prevailing under such a theory is no easy task. A plaintiff
> must point to a persistent and widespread practice of
> municipal officials, the duration and frequency of which
> indicate that policymakers (1) had actual or constructive
> knowledge of the conduct, and (2) failed to correct it due to
> their "deliberate indifference." Both knowledge and
> indifference can be inferred from the extent of employees'
> misconduct. Sporadic or isolated violations of rights will
> not give rise to *Monell* liability; only widespread or flagrant
> violations will.

*Id.* at 402-03 (citations, alterations, and quotations omitted).

A theory of inadequate training can be basis for § 1983 municipal liability in "limited

circumstances." *Brown*, 520 U.S. at 407; *see also Connick v. Thompson*, 131 S. Ct. 1350, 1359

(2011). However, there must be proof of a "deficient training 'program,' necessarily intended to

apply over time to multiple employees." *Id.* "Existence of a "program" makes proof of fault and

causation at least possible in an inadequate training case. If a program does not prevent

constitutional violations, municipal decisionmakers may eventually be put on notice that a new

program is called for." *Id.* "A pattern of similar constitutional violations by untrained

employees is "ordinarily necessary" to demonstrate deliberate indifference for purposes of

failure to train." *Connick*, 131 S. Ct. at 1360. "Without notice that a course of training is

deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a

training program that will cause violations of constitutional rights." *Id.*

The Court **GRANTS** Defendants' Motion for Summary Judgment regarding the *Monell*

claim. Plaintiffs have failed to produce sufficient material at this stage that would justify a trial

on these claims.  It is telling that Plaintiffs have spent pages of their Response and Supplemental

Response focusing on performance reviews which solely indicate that Defendants could improve

on their spell-checking abilities.  *See* (Doc. 48, at 17-19; Doc. 59, at 13).  The Court finds that

this evidence does not assist in establishing a *Monell* claim under either theory.  The Court notes

that the case Plaintiffs are advancing requires Reed and Kurfees to have engaged in the creation

of false statements that led to Plaintiffs arrests.  The Court notes that Plaintiffs can prove

deliberate indifference by the extent of the employees' misconduct; however, Plaintiffs have

failed to forecast sufficient "widespread or flagrant violations" but have rather forecast "sporadic

and isolated" incidents of unconstitutional conduct.

Of the incidents Plaintiffs document, many do not even document <u>unconstitutional</u>

<u>conduct</u>.  These include what has been referred to as the "2009 Incident" where Reed lied about

visiting his mother in the hospital and instead went drinking.   (Doc. 48, Exs. 18-19).  This also

includes the time where Reed told another officer "You did not see me here" to purportedly

obstruct an investigation into his presence at a nightclub.   (Doc. 59-1, at 1).  Another specific

instance Plaintiffs have brought up is a notation in regard to Reed's application to the Statesville

Police Department.  A person, unnamed, who interviewed his former supervisor noted that "Reed

lied to Chief 4 years ago about being in the area of a covert operation 4 times."  (Doc. 59-2).

This isolated incident occurred in 2000 and on the same page it is noted that Reed's supervisor

"doesn't want to lose him" and "[i]n past 1 ½ years, no major problems."  (*Id.*).  Plaintiffs also

spend several pages discussing whether or not Reed left a prior job, Orkin, due to dishonesty.

Plaintiffs submitted evidence that the Statesville Police Department investigated his background

and an Orkin representative indicated that he was fired for theft of property (Doc. 59, Ex. C),

despite Reed's application indicating that he was not fired and that he had not left due to

personal misconduct.  (Doc. 59, Ex. D).  Defendants supplied Statesville's "Background

Investigation" which indicates that the City investigated the allegations:

> I contacted the head of the Human Resources Department for
> Orkin Pest Control . . . .  She advised me that she did extensive
> research into the information I received on the applicant, and <u>found
> nothing to substantiate anything other than the fact that the
> applicant voluntarily resigned</u>.  There was <u>no documentation to
> support what was written</u> on the Employment History Check, and
> urged me to disregard the information I received.

(Doc. 60-2, at 2-3).  Accordingly, the Court finds that this incident cannot form the predicate for

*Monell* liability.  Plaintiffs also submitted a document entitled "CVSA QUESTIONS FOR

POLICE APPLICANTS" where, handwritten on the document are the following two questions:

> 25. Did you lie on any interviews conducted with you by
> Statesville investigators I connection with Ed Ashley?
> . . .
> 28. Did you withhold any information from investigators
> concerning the investigation of Ed Ashley?

(Doc. 59, Ex. G).  Given the title of the CVSA, the Court finds that the evidence supports that it

was in connection with his application and the background investigation found that he "passed

all relevant questions and was determined to be truthful."  (Doc. 60-2, at 2).[5]  Even if Reed were

to have withheld information, this single instance is simply not enough to hold the City of

Statesville liable under *Monell*.

Secondly, the incidents brought up are not sufficiently similar to that allegations made.

"[T]o establish deliberate indifference based on a pattern of constitutional violations, Plaintiff

must allege facts to establish the existence of "a pattern of incidents sufficiently similar to each

other, or to the one in [the plaintiff's] case.'"  *Moody v. City of Newport News, Va.*, No.

4:14CV99, 2015 WL 1347475, at *18 (E.D. Va. Mar. 25, 2015) (quoting *Johnson v. City of*

---

[5] May be inappropriate to conclude at summary judgment?

*Richmond*, No. 3:04-cv-340, 2005 WL 1793778, at *7 (E.D. Va. June 24, 2005)). For example, the fact that Reed may have what have what some consider an abrasive "Yankee" attitude is not sufficient to allow this claim to go to trial. (Doc. 59, Exs. N, O, R). Also, the fact that Reed has had several on-the-job driving-related incidents that in no way resulted in a constitutional violation does not support the *Monell* claim. (Doc. 59, Exs. U, T, V). Furthermore, Reed's "case summary" of a crack cocaine arrest is not sufficiently similar to the case at hand; while it can arguably be seen as an unconstitutional seizure, it in no way is close to the fabrication that Plaintiffs allege occurred in the instant case. (Doc. 59, Ex. K). The same issues abound with Plaintiffs' proffer of another "case summary" dealing with consent forms and warrant applications and another document dealing with consent. (Doc. 59, Ex. L-M). Reed's incident at the bank involving his approach of a former gang-member also suffers from the same issue. (Doc. 59, Ex. P). The fact that Reed questioned a man at a bank and asked for identification after he believed he saw a hand-to-hand transaction would not put the City of Statesville on notice for the allegations currently being made. (*Id.*). Further, the fact that said individual stated that "[h]e is a little concerned that Reed may be over-stepping his bounds for unethical reasons, and . . . was embarrassed by the whole incident", (*id.*), does not turn this incident into something remotely similar to that alleged in the instant case. An isolated incident from 2007 indicating that "Scott needs to spend more time studying the legal aspects of the 4th Amendment as it relates to his job (i.e. Farb's)" does not serve to put the City on notice for *Monell* purposes. (Doc. 48-13). Finally, the following entry in a performance review under "Reliability – Dependability & trustworthiness" does nothing to advance Plaintiffs case:

> Inv. Reed can be relied upon to complete his
> cases with little to no help. On one occasion
> (12-19-2011), Inv. Reed made a mistake a
> failed to attend an autopsy for a homicide he
> was working. Due to this, the photos from
> the autopsy cost the PD $10.00 each. This
> was an isolated incident and has not
> happened since.

(Doc. 48-16).

The evidence regarding Kurfees also will not, by itself or in conjunction with the evidence regarding Reed, support a *Monell* claim. The Court repeats its earlier statement regarding the grammatical errors and haste in report writing, such evidence will not support a *Monell* claim in this instance. Moreover, regarding the failure to train claim, Plaintiffs have substantiated the fact that the City of Statesville does indeed train its officers in investigative protocol regarding photographing evidence; however, they do not inform the Court of how the City could have known that Kurfees' photography skills were constitutionally inadequate. Plaintiffs have also attached a portion of a multiple choice questionnaire completed by Kurfees. The Court finds that the answers Kurfees missed could not form the basis for a *Monell* claim: several deal with consent to search, one deals with the execution of a search warrant, and one asks a question about Department OP #4, which Kurfees incorrectly marked that "[o]n occasion, an officer's probable cause to arrest evaporates after the arrest is made. In those instances, officers are required to still take the arrestee to the magistrate's office so the magistrate can officially declare there is no probable cause and to release the arrestee." (Doc. 59-29). Plaintiffs have also attached several documents showing that Kurfees was the subject of complaints during his time as a student-resource officer. One complaint alleges that Kurfees deliberately provoked

or antagonized a student because he knew the student was on probation: the complainant alleges that this conduct occurred after the student called Kurfees "a pig." (Doc. 59-31, at 1). It continues, stating that Kurfees told the student "I've got the power to make sure you spend the rest of your life in jail" when the student has not done anything. (*Id.*). Another Complaint states that Kurfees left work without filing a missing persons report for two students that ran away from the school while he was at work. (Doc. 59-31, at 3). Another document is a letter written from Sergeant York to Assistant Chief Watts regarding a Complaint dated December 20, 2011. (Doc. 59-31). The events in this Complaint cannot form the basis of *Monell* liability because they occurred <u>after</u> the events in this case. The same logic applies to the "Inquiry Notes" dated September 12, 2014. (Doc. 59-33). Another "Complaint" involves allegations of a husband regarding his wife who he claims is allowing Kurfees to sleep over in violation of their separation agreement. (Doc. 59-32, at 1-2). This allegation is far too dissimilar to make the City of Statesville liable under *Monell*. The final Complaint involves a neighbor of Kurfees' grandfather. The neighbor stated that "Kurfees called her house and told her to stop messing with his grandfather and if she didn't stop then he would take it to the next level." (Doc. 59-33, at 3). The neighbor stated that "[s]he believes that Kurfees is threatening her and is going to charge her with a fictitious crime or do her harm." (*Id.*). The neighbors belief that Kurfees may charge her with a fictitious claim does not in itself transform her complaint into evidence of unconstitutional conduct by Kurfees. With regard to Plaintiffs claims that Kurfees has not been adequately trained to be a school resource officer, the Court notes that the evidence is exactly the opposite: Kurfees attended a basic School Resource Officer program at the North Carolina Justice Academy (Dep. 211:12-212:5) and completed a 400 hour course through the North Carolina Justice Academy and was awarded a certificate (Dep. 214:3-216:4).

In fact, the training for Officer Kurfees and Investigator Reed exceeds North Carolina Department of Justice standards. (Blum Aff., Doc. 46-13, at ¶ 8(c), (e). The overall performance appraisal ratings for both Reed and Kurfees indicates that they meet or exceed expectations. (*Id.* at ¶ 8(n), (l)).

Based on the foregoing, Plaintiffs have not forecast sufficient evidence to support their *Monell* claim under any theory. For the same reason, Plaintiff may not pursue a § 1983 supervisor claim against Anderson.[6]

### B. False Arrest and Illegal Imprisonment Claims Survive Summary Judgment

Defendants move to dismiss the claims for false arrest and illegal imprisonment, noting that such claims are barred when there is probable cause for the arrest. The Court denies this motion for the same reasons as stated above.

### C. Plaintiffs Claims for Negligent Hiring, Retention, and Supervision Do Not Survive Summary Judgment

Plaintiffs assert state law claims against Anderson and the City of Statesville for negligent hiring, retention, and supervision. In order to support a claim for negligent hiring, negligent supervision, and negligent retention in North Carolina, a plaintiff must establish the following:

---

[6] A supervisor claim requires proof of the following:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices,"; and (3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994).

> (1) the specific negligent act on which the action is founded ... (2) incompetence, by inherent unfitness or previous specific acts of negligence, from which incompetency may be inferred; and (3) either actual notice to the master of such unfitness or bad habits, or constructive notice, by showing that the master could have known the facts had he used ordinary care in oversight and supervision, ...; and (4) that the injury complained of resulted from the incompetency proved.

*Davis v. Matroo*, No. 5:13-CV-00233-BO, 2013 WL 5309662, at *5 (E.D.N.C. Sept. 19, 2013) (quoting *Moricle v. Pilkington*, 462 S.E.2d 531, 533 (N.C. 1995). In such a case, a "[p]laintiff's burden is high and only cases involving notoriously unsuitable employees or allegations of misconduct repeatedly ignored by an employer have met those elements." *Id.* The Court finds that Plaintiffs have failed to carry their high burden in proving that any of the officers were incompetent, let alone notoriously unsuitable. Plaintiffs have not forecast evidence showing that the City of Statesville or Anderson was actively negligent.

> **D.      The Claims for Intentional and Negligent Infliction of Emotional Distress Survive Summary Judgment as against Reed and Kurfees**

"The elements of the tort of intentional infliction of emotional distress are: '(1) extreme and outrageous conduct, (2) which is intended to cause and does cause (3) severe emotional distress.'" *Shreve v. Duke Power Co.*, 354 S.E.2d 357, 359 (N.C. Ct. App. 1987) (quoting *Hogan v. Forsyth Country Club Co.*, 340 S.E. 2d 116, 119 (N.C. Ct. App. 1986). "In ruling on a motion for summary judgment, whether a defendant's alleged acts may be reasonably regarded as extreme and outrageous is initially a question of law." *Id.* "Conduct is extreme and outrageous when it 'exceeds all bounds usually tolerated by a decent society.'" *Id.* (quoting *Hogan*, 340 S.E.2d at 123). The Court finds that if Kurfees and Reed falsified the allegations made in the arrest warrants, such conduct would be extreme and outrageous conduct sufficient to support a

claim for intentional infliction of emotional distress.  Accordingly, the claim, along with the claim for negligent infliction of emotional distress, will survive.

### E. Plaintiffs May Seek Punitive Damages

Defendants are correct in stating that "[p]unitive damages are not a cause of action." *Cloaninger v. McDevitt*, 555 F.3d 324, 336 (4th Cir. 2009).  However, Plaintiffs have forecasted evidence sufficient to support a punitive damages claim under 42 U.S.C. § 1983[7] or under North Carolina law[8].

---

[7] Punitive damages are available in § 1983 claims "for conduct that involves 'reckless or callous indifference to the federal protected rights of others,' as well as for conduct motivated by evil intent.'"  *Cooper v. Dyke*, 814 F.2d 941, 948 (4th Cir. 1987) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)).

[8]  North Carolina law provides that:

> (a) Punitive damages may be awarded only if the claimant proves that the defendant is liable for compensatory damages and that one of the following aggravating factors was present and was related to the injury for which compensatory damages were awarded:
>
>> (1) Fraud.
>> (2) Malice.
>> (3) Willful or wanton conduct.
>
> (b) The claimant must prove the existence of an aggravating factor by clear and convincing evidence.

N.C. Gen. Stat. Ann. § 1D-15(a)-(b).

**IT IS, THEREFORE, ORDERED THAT**

(1) Defendants are granted Summary Judgment on the official capacity claims against all

Defendants;

(2) Defendants are granted Summary Judgment on the negligent hiring, retention, and

supervision claims; and

(3) Defendants' Motion for Summary Judgment is **DENIED** as to all other claims.

Signed: August 19, 2015

Richard L. Voorhees
United States District Judge